1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10

11   VERONICA OLLIER, *et al.*,            )    Civil No. 07cv714-L(WMC)
                                           )
12              Plaintiffs,                )    **FINDINGS OF FACT AND**
                                           )    **CONCLUSIONS OF LAW**
13   v.                                    )
                                           )
14   SWEETWATER UNION HIGH                 )
     SCHOOL DISTRICT, *et al.*,            )
15                                         )
                Defendants.                )
16   _____       )

17        This is a class-action case[1] in which the plaintiff class is defined as all present and future

18   Castle Park High School ("CPHS") female students and potential students in the Sweetwater

19   Union School District ("District") who participate, seek to participate, and are or were deterred

20   from participating in student athletics activities at CPHS. The class representatives are Veronica

21   Ollier, Naudia Rangel, Martiza Rangel, Amanda Hernandez and Arianna Hernandez. Defendant

22   Sweetwater Union High School District ("SUHSD" or the "District"), is a public school district

23   located in Chula Vista, California. CPHS is a school within the District.

24        Defendant District is alleged to have unlawfully discriminated against female student

25   athletes at CPHS with respect to "practice and competitive facilities; locker rooms; training

26   facilities; equipment and supplies; travel and transportation, coaches and coaching facilities;

27   scheduling of games and practice times; publicity; and funding" in violation of Title IX.

28
     _____
           [1]      The Court granted plaintiffs' motion for class certification on August 25, 2008.

                                            1

(Complaint, ¶ 40.)  Additionally, plaintiffs allege that defendant has "failed to provide female students with equal athletic participation opportunities, despite their demonstrated athletic interest and and abilities to participate in athletics." *Id.*, ¶ 71.  Because of these alleged failures, plaintiffs assert that girls' participation in sports is severely limited and interested girls are discouraged from going out for sports. *Id.*, ¶ 74.

On March 30, 2009, the Court granted plaintiffs' motion for summary adjudication on their second cause of action finding that plaintiffs demonstrated through uncontroverted, admissible evidence that defendants are not in compliance with Title IX based on unequal participation opportunities in athletic program.[2] [doc. #87] The remaining claims are violation of Title IX based on unequal treatment and benefits to females at CPHS, and retaliation.[3]

A ten-day bench trial was held between September 14, 2010 and October 15, 2010. Based on the trial, the parties' stipulations, and admitted evidence, the Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT

I.      **Equal Treatment and Benefits Under Title IX**

A.      **Background**

"The impact of Title IX on student athletes is significant and extends long beyond high school and college; in fact, numerous studies have shown that the benefits of participating in team sports can have life-long positive effects on women." *Parker v. Franklin County Community School Corp.*, 2012 WL 266870, *4 (7th Cir. January 31, 2012)(citing Dionne L. Koller, *Not Just One of the Boys: A Post–Feminist Critique of Title IX's Vision for Gender*

_____

[2]      In the same Order, the Court granted plaintiffs' motion for summary adjudication with respect to defendants' affirmative defenses: promissory estoppel, contribution and indemnity, failure to mitigate, statute of limitations, excuse, condition subsequent, good faith, act of God, failure to exhaust administrative remedies, complaint barred for failure to exhaust judicial remedies, deliberate indifference, general governmental immunity, exercise of discretion within scope of employment – Government Code § 820.2, failure to exhaust internal remedies, legitimate business purpose, business necessity, failure to comply with Tort Claims Act – Government Code §§ 900 *et seq.*, immunity from negligent misrepresentation, eleventh amendment immunity, qualified immunity and reservation of additional affirmative defenses.

[3]      Plaintiffs have stipulated that they will dismiss their 42 U.S.C. §1983 claim which results in the dismissal of claims against all individual defendants. The remaining Title IX claims are against the District defendant only.

2

1  *Equity in Sports*, 43 CONN. L. REV. 401 (2010). In her article, Koller states:

> Studies have shown that sports participation provides important lifetime benefits to
> participants such as "discipline, teamwork, time management, and leadership that
> further long-term personal growth, independence and well being" and "better
> physical and mental health, higher self-esteem, a lower rate of depression, and
> positive body image, as well as the development of responsible social behaviors,
> greater educational success, and inter-personal skills." (quotations omitted).

43 CONN. L. REV. at 413.

"[D]iscriminating against female athletes and creating feelings of inferiority with their
male counterparts can have long-lasting negative effects." *Parker*, 2012 WL 266870, *4 (citing
*Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 178 F. Supp.2d 805, 837–38 (W.D. Mich.
2001), aff'd, 377 F.3d 504 (6th Cir. 2004), judgment vacated on other grounds, 544 U.S. 1012
(2005), aff'd on remand, 459 F.3d 676, 695 (6th Cir. 2006).

Plaintiff Veronica Ollier attended CPHS for four years, graduating in 2007. She played
softball on the JV and Varsity teams during her freshman year of high school and then on the
Varsity team the remaining three years. Veronica also played basketball and was the football
team manager her first and second years of high school.

Maritza Rangel attended CPHS in 2008 and 2009. She played JV softball during her first
year of high school.

Naudia Rangel attended CPHS from the second semester of her freshman year through
her graduation ins 2007. Naudia played softball all four years she attended CPHS and played
girls' basketball during her second year of high school.

Amanda Hernandez played softball on the JV team her first, second and fourth years of
high school. She also played basketball during her time at CPHS.

Arianna Hernandez entered CPHS in 2008 and will graduated in 2012. She plays softball,
and has played Varsity water polo, and basketball. Arianna was the captain of the JV softball
team in 2008-09.

Douglas Christopher Martinez ("Coach Martinez" or "Chris Martinez") was the walk-on
coach of the CHPS girls' softball team from 1999-2006. He became the head coach of the
softball team in 2000.

Defendant District is a public school district located in Chula Vista, California. CPHS is a school within the District. CPHS has an active athletic program with numerous sports offered to enrolled students.

Maria Castilleja was the Principal of CPHS from the fall semester of 2002 through the spring semester of 2006. Paul Van Nostrand was the Athletic Director at CPHS from the 1999-2000 to 2004-05 school years; Russell Moore was the Athletic Director at CPHS from the 2005-06 school year through January 2010. The Athletic Director supervises all athletic coaches. Neither Athletic Director testified at trial. Gary Gauger is the Maintenance Manager for the District and was designated as the Person Most Knowledgeable about documents relating to improvements to the softball field at CPHS. Angela Yuhas-Russo was an English teacher who became the girls softball coach at CPHS after Coach Martinez's employment was terminated.

Just prior to the 2006-07 school year, Coach Martinez was relieved of his duties as softball coach at CPHS. On July 27, 2006, plaintiffs' counsel sent a letter regarding alleged Title IX violations at CPHS to the School Board, Interim Superintendent, Principal and Athletic Director. This action was filed on April 19, 2007.

Plaintiffs called Sue Enquist as an expert in the area of softball. She is an All-American, world champion and national champion softball player, and has coached softball at UCLA for more than 26 years. The Court found Sue Enquist qualified to testify as an expert witness regarding softball and baseball.

Plaintiffs retained Donna Lopiano as a Title IX expert. The Court qualified Lopiano as an expert witness in Title IX compliance issues. On May 9, 2008, Lopiano conducted an on-site inspection at CPHS. In conducting a comprehensive Title IX evaluation of CPHS's athletic program and facilities, Lopiano also reviewed documents produced by defendants and deposition testimony. Lopiano's evaluation used the Title IX analysis set forth in the Policy Interpretation and Investigator's Manual.

At trial, Lopiano testified that she found wide-spread Title IX equal treatment and benefits violations at CPHS. Equal treatment and benefits claims allege sex-based differences in the schedules, equipment, coaching, and other factors affecting participants in athletics. The

1   Court notes that while Lopiano's testimony was challenged, her methodology and conclusions
2   were uncontroverted.

3        **B.**    **Recruiting Benefits**

4        Each athletic coach at CPHS is tasked with recruiting new team players and conducting
5   publicity for the team. If there is no coach for a team, no recruiting occurs. The decision for how
6   recruiting is to occur is left to the discretion of the individual coaches.

7        Female athletes were provided with fewer coaches, coaches with more limited experience,
8   and coaches who were unable to adequately coach because of excessive other assignments.
9   Coaches for female athletic teams had higher turnover rates than coaches for male teams and as a
10   result, there was less stable coaching for girls' teams which in turn means less successful teams
11   and recruitment of players. Further, coaches for girls' sports teams were on several occasions
12   appointed shortly before the start of the season and therefore, there was no time for recruiting by
13   the coach. Sports teams were discontinued when coaches were not hired. The lack of coaches for
14   girls' teams impacted negatively the teams' ability to participate in conference and non-
15   conference competitions. This also influenced the ability to adequately recruit girls for athletic
16   teams.

17        For purposes of obtaining players, head coaches need time for recruiting but at least one
18   of the coaches for girls' teams was the head coach for three teams. No coach for male teams was
19   ever assigned to be head coach for three teams. The head coach for the three girls' teams was
20   unable to recruit for softball and was told by the CPHS Athletic Director to not recruit for
21   softball because she was an inexperienced new coach and had the burden of three head coaching
22   positions.

23        Coaches of boys' teams recruit more heavily than girls' teams coaches. The Athletic
24   Director went to feeder schools to talk about boys' athletic programs  programs. Middle-school
25   boys and their parents were invited to watch football practice at CPHS. There were three sports –
26   wrestling, football and roller hockey – that were designated as co-ed. Participation by girls on
27   these teams was minimal but there were no efforts by the coaches to recruit additional girls on
28   the coed teams.

1    Defendants presented no evidence that recruitment practices had changed at CPHS since
2    the filing of this action.

3    **C.   Locker Rooms, Practice and Competition Facilities**

4    For Title IX compliance, locker rooms are evaluated with respect to location, size of
5    lockers, exclusivity, and whether the locker room area is a team meeting area.

6    With respect to the quality and size of locker rooms at CPHS, 38.8% of male athletes had
7    superior facilities as compared to 0% of female athletes. The remaining 61.2% of all male
8    athletes had adequate facilities and 100% of female athletes had adequate facilities.

9    The CPHS football team had its own separate locker rooms that was rated as superior in
10   size and quality. But female athletes had access only to a generic locker room with lockers that
11   were too small to store athletic equipment, and was shared with all the other girls' athletic teams
12   and with all the other physical education classes. Because of the small size of the lockers,
13   females altthletes, including the CPHS softball team, were required to carry all of their equipment
14   with them during the school day. Female athletes at CPHS were required to vacate the girls'
15   locker room whenever a visiting football team came to campus and therefore, they were unable
16   to use the locker room during that time.

17   Locker rooms are rated superior if lockers are next to the practice and competition
18   facilities, adequate if the lockers are in close proximity and on-campus, and inadequate if lockers
19   were located off-campus. At CPHS, 82.9% of male athletes and 54% of female athletes have
20   superior location of locker rooms; 11.8% of male athletes and 40% of female athletes have
21   adequate locker rooms with respect to locker room location.

22   Superior or adequate team meeting facilities were provided to 58% of male athletes and
23   30% of female athletes. The main gymnasium at CPHS has two adjacent team rooms. The
24   basketball, volleyball and wrestling teams have access to these team rooms.

25   Prior to the 2010 softball season, the softball team did not meet in a team room. During
26   the 2010 softball season, an empty classroom near the JV field was the designated softball team
27   room; however, there were no lockers in the room. Nor was the room painted with the school
28   colors.

With respect to the quality and size of practice facilities, 90% of male athletes had superior practice facilities compared to 78% of female athletes. Dr. Lopiano's 2008 analysis of the girls' softball field, indicated that the practice facility was of much lower quality than the boys' practice facilities in that boys had separate instructional areas, more instructions aids, and additional equipment. Ninety percent of male athletes and 80% of female athletes benefitted from superior location of practice facilities.

With respect to the size and quality of competition facilities at CPHS, 97% of male athletes and 79.3% of female athletes have superior competition facilities. Adequate competition facilities were available for field hockey and tennis.

The location of athletic competition facilities showed that 86.8% of male athletes and 77.6% of female athletes had access to superior locations.

Sue Enquist testified that the softball facility was inferior to the boys' baseball facility. The baseball facility had a netted instructional complex consisting of a main competition field for practices, two pitching areas or bullpens, rollaway backstop, multi-station instructional areas, a batting cage, significant storage area, four stands for spectators, on-field facilities that allowed for multiple practice stations, protective screens, and a separate batting cage for batting from multiple areas. The baseball complex was fully enclosed which restricted its use from any other use and prevented damage from use and overuse. The playing surface was high quality, and the outfield fences were wind-screened.

Veronica Ollier and Naudia Rangel testified that when they played softball at CPHS, between 2003-07, the Varsity softball field had a too-small backstop that was wooden which allow for balls to ricochet off at a high rate of speed. The dugouts were chain-link rather than cinder block, and for most of the time, the dugouts did not have a roof. As a result the players were not adequately protected from the sun and wind, and were susceptible to distractions from spectators.

The baseball field has large, cinder block dugouts with aluminum benches with backrests, cubby holes inside the dugout to store gear, and storage attached to the dugouts. The baseball dugouts are painted with the school colors and have the school logo and mascot on them. These

dugouts allow greater privacy for greater player focus and fewer interruptions from the general public. The cinder block dugouts also provide protection against the weather for the players.

There was no outfield fence for the softball field. The infield dirt was extremely hard, uneven with many grooves and divots which caused players to be afraid of bad hops and reluctant to slide or dive for balls in the infield. There were large holes in the dirt in the batter's box. The outfield grass encroached into the infield dirt. The outfield grass was patchy, uneven and dangerous. The poor condition of the softball field made practices and games difficult and negatively impacted player development.

Because no one from CPHS was designated or acted to maintain the softball field, the softball team and its coach performed maintenance on the field. Maintenance Manager Gauger has not seen a regular maintenance schedule for the softball field. Maintenance of a softball field requires watering, raking and scarification so the dirt surface can be consistent and safe. The outfield needs cutting, watering and fertilization. At CPHS, the maintenance of the softball facility was particularly problematic because of the lack of perimeter fencing, the use of the field by physical education classes for kickball, softball and soccer, and use by the girls' field hockey and soccer programs. Recreational youth soccer leagues used the softball fields on weekends when Veronica Ollier and Naudia Rangel attended CPHS. In contrast, the boys' baseball field was not used for physical education classes or for any other uses. Regular maintenance was provided for the baseball field by the baseball coach's father, Mr. Sosa.

Administrators at CPHS knew the softball field was inferior to the baseball field. Principal Castilleja testified that she believed the softball field was in need of improvement in 2006.

In 2006-07, certain renovations to the softball field were undertaken. Roofs were added to the dugouts, new dirt was put on the infield, new pitching rubber and a permanent walkway next to the field were installed. But the new dirt did not adhere to the hard-packed dirt and as a result, the new layer of dirt did not remain in place. The newly added permanent asphalt walkway was a hazard because players in cleats could slip on the smooth surface, as Naudia Rangel did.

Sue Enquist examined the softball and baseball infields in 2008, 2009, and 2010. Each

time the softball infield was deemed to be inferior to the baseball infield. In May 2008, the softball soil was very firm and cement-like. The softball field had been insufficiently watered. The soil had not been graded to create a consistent and firm field which increased the risk of injury to the players. The hard dirt made it difficult for players to slide without being bruised. The grass in the second base area of the softball field was growing into the dirt and was unmanicured which results in unevenness of the soil area and increases inconsistent bounces in the infield. In May 2008, the boys' baseball infield playing surface was in good condition, was level, the dirt was excellent with a firm blending of two types of dirt resulting in consistent bounces and decreased risk of injury when players would slide.

In April 2009, the softball infield remained inferior to the baseball infield with respect to safety and quality. The softball infield had uneven transitions and overgrowth of grass onto the dirt while the baseball field had clean, smooth transitions from grass to dirt which allowed for a more consistent playing surface for running bases or fielding ground balls.

In May 2010, the softball infield remained inferior to the baseball infield because it had a false top layer of soil that increased the risk of injury. In contrast, in May 2010, the baseball infield had clean lines of transition and the field was manicured and level which decreases the risk of player injury.

Sue Enquist testified that the softball outfield was inferior to the baseball outfield in 2008 and 2009 in that it was uneven and consisted of areas of thatches of grass and dead areas which increased the risk of player injury and untrue or bad ball bounces.

In May 2008, there was no outfield fence at the softball field. As a result, students were able to cut through the outfield leading to more outfield grass damage. During Enquist's site visit to the softball field, a physical education class was in session on the softball field. In contrast, the boys' baseball outfield playing surface was more level, the quality of the grass was more consistent and was firmer than the girls' softball outfield playing surface.

In her site visit in April 2009, Enquist did not see improvements to the softball outfield – dead grass areas created an inconsistent playing surface and a plumbing repair to the softball outfield caused an uneven area in the grass. In May 2010, Enquist noted that the softball outfield

1  had been improved.

2  As previously noted, perimeter fencing provides for an enclosed outfield that protects the
3  field from overuse and damage. Further, not having a side fence hampers the ability to designate
4  out-of-play ball and increases the risk of injury for spectators. The boys' baseball field is
5  enclosed by fencing, includes a home run fence, and is a secure, locked facility. The baseball
6  fencing was installed approximately 20 years ago. Although CPHS Administrators were aware
7  that the softball field did not have perimeter fencing while the baseball field did, and
8  Maintenance Manager Gauger suggested the softball field be enclosed, fencing was not
9  provided.

10  In April 2009, the softball field had a non-permanent outfield fence and the site was still
11  not secured. In 2010, the varsity softball field was completely enclosed with secure, permanent
12  fencing, which included a windscreen. Enquist opined that the fencing improvements to the
13  softball field remained inferior and unsafe in comparison to the baseball field because the side
14  fencing did not have safety caps.

15  The baseball team has an instructional complex consisting of a main competition field for
16  practices, two pitching areas or bullpens, rollaway backstop, multistation instructional areas, a
17  batting cage, storage area, four grandstands for spectators, on-field facilities that allow multiple
18  practice stations, protective screens and a separate batting cage for batting from multiple areas
19  rather than just on home plate.

20  The Junior Varsity softball team practices on the JV field but plays games on the Varsity
21  field. The JV softball infield was gravel, there was little grass in the outfield, there were no fixed
22  bases, the pitcher's rubber would move around, and home plate was in disrepair. The JV field
23  had lots of potholes and rocks making for unsafe conditions for the players.

24  In 2008, Sue Enquist noted that there has been little to no maintenance to the JV softball
25  field. The infield soil was extremely hard and uneven, and stones and other debris was on the
26  field. The Varsity and JV outfields overlap making it impossible for players to use the JV and
27  Varsity fields at the same time for practices or games without risk of injury. There were no
28  dugout areas on the JV field and the backstop was too small to protect spectators at the JV field.

Also in 2008, the pitcher's rubber on the JV field was incorrectly lined up to home plate by eight feet and turned to the left. There were no fixed bases or fixed base plugs. The use of flat, rubber bases on the JV field increased the risk of injury to players who run bases.

When the perimeter fence was added to the Varsity softball facility, the practice facility outfield became non-regulation size.

Sue Enquist found no improvements to the JV field during any of her three site evaluation. There was very little to no maintenance to the field. The infield soil was extremely hard and uneven. The outfield grass was uneven with inconsistent thatches of grass. There were no dugout areas on the JV softball field and no protection was available for spectators at the field.

The softball facility has no dedicated bullpens on the field. The girls use a warm-up area that was next to the Conex box. This area is unsafe because neither the catcher nor the pitcher in the area can see that ball that is being hit from the player at home plate. The boys' baseball facility had bullpens that had cement blocks that built up the mound to maintain the mound integrity, and there were two designated lanes allowing for two sets of pitchers and catchers warming up for each team. Both bullpens had protection chainlink on one side so players were able to see the home plate area.

Because of the inferior conditions on both the JV and Varsity softball fields, players and spectators suffered injuries. Amanda Hernandez tripped over a pothole on the JV softball field in May 2010, which resulted in her being on crutches for two weeks and missing one week of school. Naudia Rangel's glasses kept breaking from balls taking wild hops on the hard dirt and hitting her in the face. A paramedic was required to assist when a spectator was hit in the head by a ball that was hit over the softball backstop.

In 2008, Lopiano deemed the girls' softball competition facility inadequate. In 2010, the Varsity softball competition facility received improvements including the installation of a permanent fence, outfield improvements, and the removal of a dangerous drainage area. Notwithstanding these improvement, the quality of the surface of the softball field remained dangerous in 2010 according to Enquist.

CPHS's baseball complex has four separate seating areas surrounding the backstop while the girls' softball complex has a single section of stands. A second set of stands was added to the softball complex. But Dr. Lopiano was unable to determine if that modification would alter her opinion that male sport facility amenities remain superior to fans of female sports.

Dr. Lopiano found that concessions for female athletic events were offered less than concessions for male athletic events and the CPHS did not have a non-discriminatory policy regarding when concessions would be provided. In 2006, the baseball field had a concession stand run by the baseball team but the softball team did not. In April 2009, Enquist found that there was a fully functioning concessions stand for baseball with snacks, drinks, apparel, and press guides for sale. Although a concession stand was added next to the softball field, no evidence was presented that it has been used or opened.

Scoreboards were available for 55.6% of all male athletes at CPHS compared to 29.9% of all female athletes.

The locker room, practice and competition facilities provided to females athletes at CPHS are unequal as compared to the locker room, practice and competition facilities provided to male athletes.

### D.     Equipment, Uniforms and Storage

Because of late hires and more inexperienced coaches for the girls' athletic teams, female athletes receive fewer and lesser quality equipment and consumable supplies compared to male athletes. Specifically, girls' sports like softball and hockey, where there are no corresponding male teams that would allow for borrowing equipment for the boys' sports, are significantly disadvantages. Softball coach Yuhas/Russo testified that she had insufficient balls for the pitching machine and could not order more because it was late in the season and budgets had been frozen.

Sue Enquist found that the softball program had significantly less sports specific equipment, e.g., ball carts, buckets and balls, than the baseball program. There was no replacement schedule for equipment that the softball team uses.

In May 2008, located on the baseball field was a large maintenance storage area that held

all maintenance-related items. There was no similar storage area on the softball field.

During Coach Martinez's tenure, because of the lack of maintenance equipment, Martinez brought in his own equipment to use on the softball field.

With respect to uniforms, there was a nondiscriminatory uniform replacement schedule in place at CPHS but coaches were permitted to make different determinations as to what they could buy with their budgets and that could be in conflict with the replacement schedule policy. Each head coach had discretion to select and order team uniforms. The Athletic Director provided no oversight to determine whether the uniform replacement schedule was followed.

Coaches were also given discretion to require their players to purchase a "spirit pack" which typically consisted of a t-shirt and pair of shorts. The Athletic Director did not provide oversight to ensure that the same percentage of male and female athletes were require to purchase the spirit packs or not.

At trial, no evidence was presented to show monitoring of uniform replacement practices for gender equity occurs.

The CPHS athletic department has a policy requiring coaches to complete an inventory at the end of each season. But defendant provided no written equipment or uniform inventories either prior to or at trial. In order to conduct a Title IX analysis concerning the quality and quantity of equipment and other supplies provided to male and female athletes, basic inventories are essential. Because defendant provided no equipment or uniform inventories at trial, Lopiano was able to consider only what she observed during her site visit.

Whether dedicated and accessible storage areas are equitably available to male and female athletes is part of a Title IX analysis. Lopiano found that 65% of male athletes and 41% of female athletes had dedicated storage areas. CPHS provided the softball team with half of a Conex box in which to store softball equipment; the other half was used by the boys' baseball program. But in addition to the Conex box, the boys' baseball team had a storage room attached to their dugouts.

In May 2008, player equipment storage, *i.e.*, where players have their bat bags, helmets and other amenities that they use as individual players, was available for CPHS baseball players

only. There was no such equipment storage for the girls' softball players.

No evidence was presented that defendant monitors the provision of athletic equipment storage for gender equity. The Athletic Director did not provide any oversight for gender equity in the provision of equipment, supplies and uniforms to ensure that male and female athletes were provided with the same benefits.

### E. Scheduling Benefits

Girls and boys are required under Title IX to have the same optimum practice or competition times. Immediately after schools is the most desirable practice times for sports. With respect to desirable competition times, that time is when parents are available to come and watch the sporting events. Ordinarily, desirable competition times are early evening rather than immediately after school.

Dr. Lopiano testified that female athletes had less access to premium game times than male athletes. Girls basketball games were played on Friday nights at 6:00 p.m. while the boys' basketball games were played on Friday nights at 7:30 p.m. No effort was made to alternate the times by week or season. Similarly, boys' water polo was scheduled for Fridays at 5:00 p.m. and the girls' events were at 3:00 p.m.; field hockey competition was scheduled at 3:00 or 5:00 p.m. but boys' football played in the evening. Girls' basketball practice times were from 5-7:00 p.m., while the boys' Varsity basketball team practiced immediately after school during all four years Amanda Hernandez was at CPHS.

In 2010, boys' and girls' basketball scheduling was corrected to meet equitable competitive scheduling requirements but no evidence of any other time changes for any other sports was produced.

Athletic Director at CPHS permitted coaches to determine practice times. There is an absence of monitoring athletic practice times for gender equity at CPHS. Similarly, the District did not appoint a person responsible for monitoring the number of practice opportunities provided to the school's athletic teams for gender equity.

### F. Equal Access to Coaching

Female athletes were provided with fewer coaches. The athlete/coach instructional ratio,

which is calculated by dividing the total number of athletes on a team by the total number of coaches provided to that team, is an indicator of access to equitable coaching for males and females. The athlete/coach instructional ratio for females was not equal to that afforded to males.

Assistant coaches were not provided in the same quantity or quality for female athletes at CPHS. Head coaches who were assigned late, which happened with some frequency, did not get an assistant coach although head coaches had the discretion to decide what assistants they needed.

The Athletic Director allowed coaches of boys' teams to use their coaching salary for additional assistant coaches. As a result, coaching support for the boys' programs was not equitably determined based on the coaching salary schedule. Although the salary would appear equal for the baseball and softball coaches, there were more baseball coaches because the head baseball coach did not take his salary but instead used his salary for assistant coaching salaries. More assistant coaches for the baseball team were available than provided for the softball team.

In the season after Coach Martinez was terminated, softball coach Yuhas/Russo decided not to have any assistant coaches for the Varsity and JV teams. This resulted in her being the only coach present at practices and games.

The hiring of coaches for girls' sports was the responsibility of the Athletic Director. An open coaching position was first offered to on-campus teachers through the school's Daily Bulletin. If no response was obtained, the position was posted at the District. CPHS would take no other action to fill an open coaching position.

If no coach was hired, a team was discontinued. The current athletes in that sport would be unable to participate during that year and even if a team was reconstituted the following year, the participants would have an inferior schedule. This is because the Metro Conference would not create a conference schedule for the following year for sports that were not sponsored in the current year.

Girls' field hockey, tennis, water polo and golf teams have often lacked consistent coaching staffs. CPHS had no girls' field hockey team in 2005, 2007 or 2008, or girls' tennis team during the 2007 and 2008 school years because no coaches were hired for those sports.

Neither girls' water polo nor girls' lacrosse has been offered at CPHS, also because CPHS failed to hire coaches. CPHS' lack of efforts to consistently and timely obtain coaches for girls' teams severely impacts girls' opportunities for competitive athletics.

Athletic Director Moore acknowledged that he had not done any analysis on gender equity for the quality of coaches for the boys' and girls' teams. Nor did CPHS conduct any reviews to determine if they were providing quality coaches equitably to male and female athletes.

### G.      Medical and Training Services

At CPHS, an athletic trainer, Eddy Ayub, was available during the fall football season to work with the football players.  Also during the fall, a physician, Dr. Camarada, was available for rehabilitation every Saturday morning. The Saturday clinic was predominately during the football season but was not limited to football.

Dr. Lopiano opined that if it were assumed that only athletes who participated in fall sports had access to the trainer and doctor, 43% of the male athletes and 29% of the female athletes could receive these services.

The weight training facility, while available for use by boy and girls, was used predominately by boys. The nature of the available equipment at CPHS was designed for absolute-strength-based sports in which boys' participate. For women's sports, a training facility will typically have lower weight plates, free weights, flexibility equipment, core strength equipment. In 2010, significant changes were made to the weight-training and conditioning facility with the intent to make the area more gender equitable. But no evidence was presented that the renovated facility was being used by girls' and boys' teams in an equitable manner. Further, neither the Athletic Director nor defendant monitored weight room usage for gender equity.

### H.      Publicity and Promotional Support

At CPHS, there was greater coverage of boys' athletic teams than girls' teams in the yearbook. The Castle Park Daily Bulletin featured almost twice as many announcements for boys' athletic teams compared to announcements for girls' athletic teams. Coaches have

discretion to submit announcement to the Daily Bulletin. Coach Martinez never was told he needed to do any publicity on behalf of the softball team during his seven years as coach.

Band, cheerleaders and pep squads can provide support at athletic events. Forty-six per cent of male athletes and 13% of female athletes received the benefit of a band being at their events.

The cheerleaders' schedule was decided at the discretion of the cheer coach. During the time Veronica Ollier was at CPHS, the cheerleaders would cheer for football and boys' basketball games but not for any girls' teams games.

From 1998 through the date of the trial, no one at CPHS was tasked with monitoring publicity or promotional opportunities for gender equity. The publicity or promotional opportunities at CPHS include the Daily Bulletin, announcements, the electronic marquee, and yearbook.

## I.     Fund-raising Benefits

Equitable Fund-raising benefits are required under Title IX. At CPHS, boys teams were permitted to fund-raise. The boys' baseball team sold concessions from their snack stand and the money raised was used for the baseball team. In contrast, softball coach Yuhas/Russo was permitted by the Athletic Director to prohibit all fund-raising by the softball team. As a result, the girls were unable to attend post-season competitions or non-conference competitions that they had previously attended with parent-raised funds.

A grant-making body – the Trojan Foundation – supported the athletic program at CPHS. The coaches of girls' teams were not advised as to what they could request and the method for receiving Trojan Foundation funds. Because the coaches for boys' teams did not have the same turnover rate as coaches for the girls' teams, they were aware of the availability of and requirements for obtaining Trojan Foundation funds. It was the responsibility of the Athletic Director and defendant to inform coaches about their funding sources so that equitable access to those sources could be obtained. Testimony was presented that action has been taken to remedy this disparity in this particular Fund-raising practice.

No one at CPHS has monitored Fund-raising opportunities or donations to the athletic

program for gender equity. Defendant did not present any evidence to indicate that this situation has changed.

### J.  Administrative Activity

CPHS failed to provide a system for Title IX implementation and compliance. Instead, Title IX compliance was at the discretion of individual coaches and the defendant did not monitor coaches to determine if equitable treatment and benefits for male and female athletes was carried out. School principals are tasked with ensuring that the individual school is in compliance with Title IX. The Athletic Director is generally given the responsibility, however, to monitor gender equity requirements.

Mercedes Lopez is the Director of Student Support Services at the District and, since 2010, she is the District's Title IX Coordinator. Her responsibility is to submit a report to the U.S. Department of Education Office of Civil Rights every two years regarding participation numbers. She testified that she based her reports on information reported to her by the high schools in the District and she did not independently verify the numbers she received from the school.

No evidence was presented that CPHS had ever conducted a Title IX self-evaluation, a requirement under the implementing regulations.

As a result of systemic administrative failures at CPHS, female athletes have received unequal treatment and benefits before and during the time this action has been pending. Although some remedial measures have been taken at CPHS, particularly with respect to the girls' softball facility, those steps have not been consistent, adequate or comprehensive. Additionally, there has been no evidence presented that the District has addressed or implemented policies or procedures designed to cure the myriad areas of general non-compliance with Title IX.

## II.  Retaliation

Steve Rangel, parent of named plaintiff Maritza Rangel, complained to CPHS Principal Castellija and Athletic Director Moore about inequalities for girls in the school's athletic programs in May 2006. Rangel met with Principal Castellija about improvements for the girls'

softball field and non-compliance with Title IX.

Also in May 2006, Rangel spoke to Moore about Title IX concerns relating to improvements to the softball field dugouts, including needed fencing, grass growing in the infield, a broken backstop, potholes in the outfield, and limited audience seating. Moore informed Assistant Principal Duggan a few days later of his meeting with Rangel. Moore did not recall Duggan doing anything about Rangel's complaint about the softball field, took no further action and spoke to no one else about alleged Title IX violations at CPHS.

Moore and Coach Chris Martinez, who had been a walk-on softball coach for seven years at CPHS, held a meeting in May 2006, that was intended to discuss the upcoming softball season and to walk the softball field. Rangel was also present at the meeting between Moore and Martinez. Rangel pointed out the disparities between the girls' softball field and the boys' baseball field. In his deposition, Moore acknowledged that he told Martinez, with Rangel present, that walk-on coaches, *i.e.,* coaches who were not CPHS teachers, could be released from their employment at any time. Both Martinez and Rangel understood that Moore was threatening to terminate Martinez's continued coaching of the softball team if additional complaints were made about the girls' softball facilities. Moore also stated that the gymnasium was more of a priority than the softball field. Approximately six weeks after this conversation, Coach Martinez was terminated by Principal Castellija.

Defendants provided several reasons for terminating Martinez: (1) the school wanted to replace coaches with certified teaching employees; (2) Martinez improperly determined the eligibility of a player and the softball team forfeited games as a result; (3) Rangel could not get his Blue Card to coach but Martinez allowed him to coach the summer club team; (4) Martinez provided late paper work to the school board in seeking approval for a tournament in Las Vegas and although the Board made an exception allowing the team to go on the trip, the trip posed an unnecessary liability risk for the Board.

In January 1987, a preference for certified teachers as coaches was adopted and has remained in place. The long-standing policy is to first offer a coaching position to a certified employee if a coaching position becomes available and is implemented as coaching vacancies

1   arise. Once an individual becomes a District employee, it no longer matters whether a coach is a
2   certified teacher or not. When a coaching vacancy occurs it is offered to a certified employee
3   and if a coaching position is not covered, the position is offered more broadly. A certified
4   teacher does not have the right to have a coach removed so the teacher can fill a coaching
5   position. When Principal Castilleja terminated Martinez, she did not have anyone selected to fill
6   the coaching position.

7       Coaches are not responsible for determining the academic eligibility of students to play
8   on athletic teams. Assistant Principal Mary Rose Peralta was responsible for eligibility
9   determinations in 2005. In 2005, Coach Martinez mistakenly believed a player, Erica Rangel,
10  was eligible to play. When the Administration determined Rangel was academically ineligible
11  and had been improperly played, the girls' softball team forfeited games. Even though the
12  playing of an ineligible player and the resulting forfeiture of games were given as a reason for
13  Martinez's termination, Castilleja did not write up Martinez and no action was taken against him
14  at the time. Martinez had been told by a prior assistant principal in charge of eligibility that
15  taking an advanced placement class could be used in determining eligibility. Assistant Principal
16  Peralta wrote to the CIF stating that Martinez had made an honest mistake in determining the
17  eligibility of Erica Rangel. During the seven years Martinez coached, he did not play any other
18  ineligible player. Other CPHS coaches had played ineligible players but no other coach was
19  disciplined for this infraction. Athletic Director Moore apologized to Martinez for providing
20  incorrect information concerning eligibility rules and agreed that the system for determining
21  eligibility was difficult. Finally, the eligibility error occurred in the 2004-05 school year but
22  Martinez was not terminated or otherwise disciplined that year.

23      In order for a parent or other individual to assist with on-campus athletic activities, a Blue
24  Card must be obtained. Parent Steve Rangel had a Blue Card from1997 to 2002, and coached in
25  the District. But when Rangel reapplied for a Blue Card in 2006, he was denied due to felony
26  convictions on his record. While his application for a Blue Card was pending, Rangel had
27  assisted with coaching during the school year. Once Martinez was told not to allow Rangel to
28  coach because Rangel could not obtain a Blue Card, Rangel no longer assisted with coaching the

school's softball team. Athletic Director Moore told Rangel, however, that he could help maintain the softball field without a Blue Card. Principal Castilleja saw Rangel on the softball field in the summer of 2006, when Martinez was not present. The summer ball club was not under the auspices of the high school. Martinez asked for assistance from CPHS administrators to deal with Rangel in keeping him off the field because the school had responsibility for dealing with Rangel as the parent of a player.

In 2005, Coach Martinez did not comply with the required submission of paperwork prior to leaving on a softball team trip. Castellija admitted she did not write him up for anything, including the late paperwork in 2005.  In 2006, Martinez completed the required paperwork for a team trip to Las Vegas although he turned in the paperwork late. After the Las Vegas trip, Martinez and Moore met to discuss the upcoming 2006 softball season.

## CONCLUSIONS OF LAW

**I.    Title IX, Equal Treatment and Benefits**

Title IX prohibits sexual discrimination in educational programs or activities that are supported by federal financial aid. 20 U.S.C. § 1681(a). Title IX and its implementing regulations provide:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intermural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

34 C.F.R. § 106.41(a).

"Congress enacted Title IX in response to its finding—after extensive hearings held in 1970 by the House Special Subcommittee on Education—of pervasive discrimination against women with respect to educational opportunities*." Cohen v. Brown Univ. ("Cohen II")*, 101 F.3d 155, 165 (1st Cir. 1996). The goals of Title IX were "to avoid the use of federal resources to support discriminatory practices" and "to provide individual citizens effective protection against those practices." *Id.* (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979)).

Title IX requires "equal treatment," which has been interpreted by the OCR to require "equivalence in the availability, quality and kinds of other athletic benefits and opportunities

provided male and female athletes." Department of Education, Office for Civil Rights, Policy Interpretation ("Policy Interpretation"), 44 Fed. Reg. 71,413, 71,417-418; Clarification of Intercollegiate Athletics Policy Guidance: The Three–Part Test (Clarification) (1996). Equal treatment claims allege sex-based differences in the schedules, equipment, coaching, and other factors affecting participants in athletics. *See McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 299 (2d Cir. 2004). Policy interpretation by the OCR is entitled to deference by the Court. *Mansourian v. Regents of the University of California, University of California at Davis*, 594 F.3d 1095, 1103, n.9 (9th Cir. 2010). The Court takes judicial notice of the *Title IX Investigator's Manual,* Office of Civil Rights, Department of Education (1990) ("Investigator's Manual").

Compliance in the area of equal treatment and benefits is assessed based on an overall comparison of the male and female athletic programs, including an analysis of recruitment benefits, provision of equipment and supplies, scheduling of games and practices, availability of training facilities, opportunity to receive coaching, provision of locker rooms and other facilities and services, and publicity. 34 C.F.R. 106.41(c).

"[A] disparity in one program component (*i.e.*, scheduling of games and practice time) can alone constitute a Title IX violation if it is substantial enough in and of itself to deny equality of athletic opportunity to students of one sex at a school." *McCormick v School Dist. of Mamaroneck*, 370 F.3d 275, 293 (2d Cir. 2004); Policy Interpretation, 44 Fed. Reg. 71,417 (Dec. 11, 1979). A disparity in one program component, however, "can be offset by a comparable advantage to that sex in another area," *McCormick*, 370 F.3d at 293, as long as "the overall effect of any differences is negligible." Policy Interpretation, 44 Fed. Reg. at 71,415.

### A. Recruiting Benefits

Equal efforts to recruit male and female athletes are required under Title IX. Policy Interpretation, 44 Fed. Reg. at 71,417. The evidence presented at trial demonstrates that defendants have not instituted recruiting policies and have failed to monitor athletic recruiting that provide for equitable efforts to recruit female athletes at CPHS. As a result, there are significant disparities in female athlete recruitment. Female athletes at CPHS are denied

1  opportunities and benefits that male athletes have and these opportunities are not negligible. This

2  violates Title IX.

3        **B.**    **Locker Rooms, Practice and Competition Facilities**

4      Male and female athletes are required under Title IX to have access to the same quality

5  facilities on the same basis. Policy Interpretation, 44 Fed. Reg. at 71,417.

6      The evidence provided at trial demonstrates that the quality, size and location of the

7  locker rooms were better for male athletes than female athletes at CPHS. Similarly, the evidence

8  shows that male athletes have higher quality practice and competitive facilities than female

9  athletes. The boys' facilities also are better maintained and protected from damage and overuse.

10 Defendants do not monitor locker rooms, practice and competition facilities for gender equality.

11 The disparities concerning locker rooms, practice and competition facilities are disadvantages to

12 female athletes that are not negligible.

13       **C.**    **Equipment, Uniforms and Storage**

14     Under Title IX, schools must provide female athletes with equitable "equipment and

15 supplies which include, inter alia, uniforms, sport-specific equipment, general equipment, and

16 conditioning and weight-training equipment. Policy Interpretation,  44 Fed. Reg. at 71,416.

17 Supplies are assessed for quality, amount, suitability, maintenance and availability. *Id.*

18     Male athletes were provided with more and superior quality equipment and supplies than

19 those provided to female athletes. The availability and type of uniforms provided to the female

20 athletes were not equitable compared to male athletes. Further, male athletes were provided with

21 more and better storage facilities than the female athletes at CPHS.

22     The disparities in the provision of equipment, uniforms and storage denied girls

23 opportunities and benefits that boys enjoy, and that denial of opportunities and benefits was not

24 negligible.

25       **D.**    **Scheduling Benefits**

26     Male and female athletes are entitled to equitable number of competitive events per sport,

27 the time of day competitive events are scheduled, the number and length of practice

28 opportunities, and the time of day practice opportunities are scheduled. Policy Interpretation, 44

Fed. Reg. at 71,416.

Because of defendants' consistent failure to timely hire coaches for girls' sports, girls were provided with fewer competitive opportunities than boys. Boys also had greater access to premium game times for competition and practice times that are provided immediately after school than the girls.

Evidence produced shows that defendants do not monitor this element for gender equity. These disparities are in scheduling benefits are not negligible.

### E. Equal Access to Coaching

Female and male athletes are required to receive equivalent opportunities for quality coaching under Title IX. Policy Interpretation, 44 Fed. Reg. at 71,416. Equivalent coaching is assessed by examining the relative availability of full-time coaches, part-time coaches and assistant coaches. *Id*. With respect to the assignment of coaches, compliance with Title IX is assessed by examining the training, experience, and other qualifications of coaches and their professional standing. *Id.*

The girls' teams coaches at CPHS were fewer in number, less experienced, and more overburdened than the boys' teams coaches. This disparity directly impacted the quantity and quality of the instructional benefits that the coaches provided to the female athletes. The disadvantages to the girls in equal access to coaching are not negligible.

### F. Medical and Training Services

Title IX requires medical and training services to be provided equitably. Policy Interpretation, 44 Fed. Reg. at 71,417.

Male athletes at CPHS were provided with greater access to athletic trainers and medical services than female athletes. These disparities deny girls opportunity and benefits that boys enjoy and they are not negligible.

### G. Publicity and Promotional Support

Equitable publicity benefits and promotional support are required under Title IX. Policy Interpretation, 44 Fed. Reg. at 71,417.

Factors to consider in assessing whether publicity is equitably provided include access to

1  publicity resources. The quantity and quality of publications and other promotional devices

2  featuring men's and women's programs. *Id.*

3       Evidence presented shows that girls' athletic activities were provided with less coverage

4  and promotion in yearbooks, fewer announcements in the school's Daily Bulletin, less signage

5  on the school's electronic marquee, and inferior signage. The CPHS band and cheerleaders

6  performed at more boys' sports than girls' sports.

7       The inferior publicity and promotional support to girls are not negligible.

8       **H.  Fund-raising Benefits**

9       Title IX requires that revenues from all sources be used to provide equitable treatment

10  and benefits to both girls and boys. A source of revenue may not justify the unequal treatment of

11  female athletes. Investigator's Manual at 5.

12       Defendants fail to monitor athletic Fund-raising opportunities and allow coaches full

13  discretion over Fund-raising. Further, defendants do not review this element for gender equity.

14       **I.  Mootness**

15       Since the filing of this action, defendants have made some improvements to the girls'

16  athletic facilities and the scheduling of boys and girls basketball. Mootness can be found when a

17  defendant voluntarily ceases a practice when "the record [] show[s] that (1) it can be said with

18  assurance that there is no reasonable expectation . . . that the alleged violation with recur, and (2)

19  interim relief or events have completely and irrevocable eradicated the effects of the violation."

20  *Sossamon v. Texas*, 131 S. Ct. 1651, 1668 (2011) (citing *Smith v. Univ. of Wash. Law Sch.*, 233

21  F.3d 1188, 1194 (9th Cir. 2000)(alteration in original)). Although defendant may change a

22  policy or take some remedial measures while litigation is pending, the fact of "voluntary

23  cessation" nevertheless may allow claims to go forward. *Sossamon*, 131 S. Ct. at 1670 (2011);

24  *see e.g., Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 719

25  (2007) ("Voluntary cessation does not moot a case or controversy unless subsequent events

26  make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected

27  to recur" (internal quotation marks and alterations omitted)); *United States v. Bradau*, 578 F.3d

28  1064, 1068 (9th Cir. 2009)(citing *Friends of the Earth, Inc. v. Laidlaw Environmental Services*

*(TOC), Inc.*, 528 U.S. 167, 189 (2000)).

The Supreme Court has stated that when a party asserts that a case has become moot, "[t]he burden of demonstrating mootness 'is a heavy one.' " *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979).

In this case, even though defendants have presented some evidence of changes to athletic facilities at CPHS and scheduling of basketball practices and games, additional evidence shows that many violations of Title IX have not been remedied or even addressed. Because of defendants' continuing failure to address gender equity in athletics in a full and comprehensive manner, CPHS has not met its burden to demonstrate that the interim measures have completely and irrevocably eradicated the effects of the alleged violations. This action is not moot.

**II.    Retaliation**

"[R]etaliation against individuals because they complain of sex discrimination is 'intentional conduct that violates the clear terms of [Title IX].'" *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173–174 (2005). Courts generally look to Title VII cases to define Title IX's applicable legal standards. *Burch v. University of Cal. Davis*, 433 F. Supp.2d 1110, 1125 (E.D. Cal. 2006); *see also Oona R.-S. by Kate S. v. McCaffrey*, 143 F.3d 473, 476 (9th Cir.1998) (holding that Title VII standards apply to hostile environment claims under Title IX). Under Title VII, and, by analogy, Title IX, to establish a *prima facie* case of retaliation plaintiffs must show: (1) they engaged in a protected activity; (2) they were thereafter subjected to an adverse action; and (3) a causal link exists between the protected activity and the adverse action. *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 91 (2d Cir. 2011); *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir.1994); *see also Jackson*, 544 U.S. at 184. Once the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to advance a legitimate, non-retaliatory reason for its conduct; "if it does so, the plaintiff must be able to convince the factfinder both that the [defendant's] proffered explanation was false, and that retaliation was the real reason for the adverse . . . action." *Isler v. Keystone Sch. Dist.*, 2008 WL 3540603, at *4 (W.D. Pa. Aug.12, 2008) (internal quotations omitted).

Plaintiffs engaged in the following protected activities: Parent Steve Rangel complained

1  of Title IX violations to Athletic Director Moore and to Principal Castilleja; counsel for

2  plaintiffs sent a letter regarding Title IX violations at CPHS to the School, Board, Interim

3  Superintendent, Principal, and Athletic Director in July 2006; and plaintiffs filed this action in

4  April 2007.

5  Plaintiffs suffered adverse actions as follows: Coach Martinez was terminated shortly

6  before the start of the softball season for pretextual reasons; Coach Martinez was replaced with a

7  far less experienced coach who did not conduct a winter ball program; the softball team had no

8  assistant coaches; the replacement coach was assigned as the head coach for three sports; the

9  girls' softball program was disrupted; the softball program's donated Conex box was removed;

10  the 2007 softball teams did not obtain necessary equipment; an annually celebrated banquet for

11  the 2007 softball team was not held; award letters and patches to plaintiffs during their senior

12  year were not given; parents were not permitted to volunteer for the softball team; the softball

13  team's Las Vegas tournament opportunity was withheld. These actions were adverse to plaintiffs

14  because their long-term and successful softball program was significantly disrupted to the

15  detriment of the program and participants.

16  A causal link may be established by an inference derived from circumstantial evidence,

17  such as knowledge of plaintiffs participation in protected activities and the proximity in time

18  between the protected action and allegedly retaliatory adverse action. *Jordan v. Clark*, 847 F.2d

19  1368, 1376 (9th Cir.1988). In the present case, there was a causal connection between the

20  protected activities and the adverse actions in temporal proximity: plaintiffs engaged in

21  protected activities in May and July 2006, and April 2007, and adverse actions were taken

22  against plaintiffs in July 2006, and Spring of 2007.

23  Defendant must articulate a legitimate, non-retaliatory reasons for its action. "The

24  defendant's burden at this stage is one of production, not persuasion. The court may not make a

25  credibility assessment." *Njenga v. San Mateo County Superintendent of Schools*, 2010 WL

26  1261493, at *14 (N.D. Cal. 2010) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.

27  133, 142 (2000)).  As set forth above, defendants offered four non-retaliatory reasons for

28  terminating Martinez.

27

Then plaintiffs must show defendant's proffered explanation was false, and that retaliation was the real reason for the adverse action.

Prior to the May 2006 meeting between Martinez and Athletic Director Moore, the clear intention was for Martinez to continue coaching the 2006-07 season. It was only after Rangel raised Title IX non-compliance issues for the first time at the May 2006 meeting that Martinez's coaching position was threatened by the Athletic Director. Shortly thereafter, Martinez was terminated as coach for girls' softball.

A preference for certified teachers was in place long before Martinez was hired. Principal Castilleja denied speaking to coaches in 2005-06 about wanting to go in a different direction by having more on-campus coaches. Offering a coaching position to a certified employee occurs only when vacancies arise. When Castilleja terminated Coach Martinez, she had no certificated employee ready to replace Coach Martinez.

The student eligibility situation occurred during the 2004-05 school year. Martinez was not written up for the forfeited games in 2005. Nor was Martinez terminated after that year but instead after the 2005-06 school year. Determination of player academic eligibility was the responsibility of school administration, specifically Assistant Principal Mary Rose Peralta, not Coach Martinez. Peralta acknowledged that Martinez made an honest mistake concerning his belief that the student was eligible to play.

Martinez did not permit Steve Rangel to coach after being notified Rangel could not obtain a Blue Card. The summer softball club that was practicing at CPHS was not conducted under the auspices of the high school. Martinez was not present when Principal Castilleja saw Rangel on the softball field.

Prior to the date of the Las Vegas softball team trip, Martinez provided the required paperwork to the District, albeit late. Principal Castilleja did not write up Martinez for the late paperwork. The May 2006 meeting between Moore and Martinez was to discuss the coming softball season so there was no intent to terminate Martinez for the late paperwork.

Defendant's stated reasons for Martinez's termination are not credible and are pretextual. / / /

### RELIEF

Since the filing of this action, defendants have made some improvements to facilities in an attempt to bring the facilities and programs into Title IX compliance. The improvement include: the removal of the inadequate JV field; the creation of a dedicated softball field enclosed by fencing; new, covered dugouts with cubbies; backstop; grandstand; maintenance schedules for watering; and a better infield. Other improvements include the scheduling of practices to avoid discrimination over practice times on dual facilities. Expert witness Donna Lopiano testified to the substantial inequities in most of the programs identified in the Investigator's Manual on her site visit. In some cases she was unable to fully evaluate whether gender equity was in place because of inadequate information provided by the defendants. Overall she found CPHS was not in compliance with Title IX. Lopiano also testified that a subsequent site visit would not change her opinion about compliance even though improvements had been made specifically to the softball facilities because her opinion was based on overall compliance of the athletic program at CPHS rather than limited remediation. Looking to hand-selected individual changes or improvements without conducting a new overall study is insufficient for determining compliance with Title IX.

Defendants have violated Title IX in failing to provide equal treatment and benefits, and retaliating against the plaintiff class. Plaintiffs are entitled to declaratory relief.

Injunctive relief is appropriately granted under Title IX. In order to be entitled to permanent injunctive relief, a plaintiff must establish the following: (1) the likelihood of irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *Sierra Forest Legacy v. Sherman*, 2011 WL 2041149, at *16 (9th Cir. May 26, 2011).

Here the plaintiff class has suffered and continues to suffer irreparable injury. Female athletes and potential athletes have been denied the opportunity to participate in high school sports on an equal level with the male students at their school. When inequalities are not

1    addressed and corrected, female athletes, prospective students, faculty and the community at

2    large, are told athletics for girls are not as important as boys.

3        The balance of hardships weighs firmly in plaintiffs' favor. The inequalities demonstrated

4    at trial should have been rectified years ago by the District. Female students consistently have

5    been denied athletic opportunity equal to male students. This inequity is highlighted and most

6    apparent between the boys' baseball team and the girls' softball team at CPHS. The girls' softball

7    team has been treated as vastly inferior to the boys' baseball team, which it is not.

8        The public interest in remedying gender discrimination is strong and promoting

9    compliance with Title IX is an important societal value:

10       Equal athletic treatment is not a luxury. It is not a luxury to grant equivalent
         benefits and opportunities to women. It is not a luxury to comply with the law.
11       Equality and justice are not luxuries. They are essential elements which are woven
         into the very fiber of this country. They are essential elements now codified under
12       Title IX.

13   *Cook v. Colgate Univ.*, 802 F. Supp. 737 (N.D.N.Y. 1992) (holding that university's unequal

14   treatment of men's and women's ice hockey teams violated Title IX), vacated as moot, 992 F.2d

15   17 (2d Cir. 1993).

16       A recent assessment of the impact of Title IX suggests:

17       Although Title IX has gone a long way in increasing the status and respect for
         female athletes, discrimination endures. Title IX has not ended the long history of
18       discrimination against females in sport programs; many educational institutions
         continue to place male sport programs in a position of superiority. *See McCormick
19       v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 296 (2d Cir. 2004) ("Despite
         substantial progress in attitudes about women and sports, the competitive
20       accomplishments of male athletes may continue to be valued more than the
         achievements of female athletes.").

21

22   *Parker*., 2012 WL 266870, *4.

23       Because of the defendant's long-standing and continuing overall violations of Title IX

24   with respect to the treatment and benefits accorded female athletes compared to male athletes,

25   and the fact that interim remedies have not completely and irrevocable eradicated the effects of

26   these violations, this action is not moot.

27       Based on the foregoing, plaintiffs are entitled to injunctive relief. Defendants are required

28   to comply with Title IX in all aspects of its athletic programs and activities at CPHS and

1  violations identified through this action be corrected.

2          The parties are directed to jointly prepare a proposed compliance plan to include the

3  Court's continuing jurisdiction and the monitoring of defendants' athletic programs and

4  activities. The parties shall submit the proposed compliance plan within 45 days of the filing of

5  this Order.

6          **IT IS SO ORDERED.**

7  DATED:  February 9, 2012

8                                                          _____

9                                                          M. James Lorenz
                                                           United States District Court Judge

10  COPY TO:

11  HON. WILLIAM McCURINE, JR.
    UNITED STATES MAGISTRATE JUDGE

12

13  ALL PARTIES/COUNSEL

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28