UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERONICA OLLIER, *et al.*, | Civil No. 07cv714-L(JMA) |
| Plaintiffs, | **ORDER GRANTING MOTION TO ENFORCE PERMANENT INJUNCTION [doc. # 225] and SETTING ORDER TO SHOW CAUSE WHY DEFENDANT SHOULD NOT BE HELD IN CONTEMPT** |
| v. | |
| SWEETWATER UNION HIGH SCHOOL DISTRICT, *et al.*, | |
| Defendants. | |

A 10-day bench trial in this Title IX class-action case resulted in Findings of Fact and Conclusions of Law ("FFCL") addressing defendant District's violation of Title IX based on unequal treatment and benefits to females at Castle Park High School ("CPHS") in the Sweetwater Union School District ("District") and retaliation. The Court had previously granted plaintiffs' motion for summary adjudication on their second cause of action finding that plaintiffs demonstrated through uncontroverted, admissible evidence that defendant District was not in compliance with Title IX based on unequal participation opportunities in athletic program at CPHS. [doc. #87]

In the FFCL, the Court noted that "[c]ompliance in the area of equal treatment and benefits is assessed based on an overall comparison of the male and female athletic programs, including an analysis of recruitment benefits, provision of equipment and supplies, scheduling of games and practices, availability of training facilities, opportunity to receive coaching, provision

of locker rooms and other facilities and services, and publicity. 34 C.F.R. 106.41(c)." (FFCL at 22.) The Court discussed the deficiencies of defendant's compliance with Title IX in each of these areas and concluded that:

> As a result of systemic administrative failures at CPHS, female athletes have received unequal treatment and benefits before and during the time this action has been pending. Although some remedial measures have been taken at CPHS, particularly with respect to the girls' softball facility, those steps have not been consistent, adequate or comprehensive. Additionally, there has been no evidence presented that the District has addressed or implemented policies or procedures designed to cure the myriad areas of general non-compliance with Title IX.

(FFCL at 18.)

> . . .
> Defendants have violated Title IX in failing to provide equal treatment and benefits, and retaliating against the plaintiff class. Plaintiffs are entitled to declaratory relief.

(FFCL at 29.)

Further, the Court found and concluded that plaintiffs were entitled to injunctive relief and therefore ordered defendant "to comply with Title IX in all aspects of its athletic programs and activities at CPHS and violations identified through this action be corrected." (FFCL at 30-31.) The parties were directed to "jointly prepare a proposed compliance plan to include the Court's continuing jurisdiction and the monitoring of defendants' athletic programs and activities." (FFCL at 31.)

After the filing of the FFCL, defendant filed a motion for more definite statement and for additional or new findings under Federal Rules of Civil Procedure 52(b) and 59(a)(2). [doc. #197] The parties filed a Joint Compliance Plan on March 26, 2012. [doc. #200] On June 21, 2012, the Court denied defendant's motion. Defendant then filed a Notice of Appeal to the Ninth Circuit Court of Appeals of the FFCL and the Order denying defendant's motion.

No further action occurred in the district court because of the pending appeal. "Once a notice of appeal is filed, the district court is divested of jurisdiction over the matters being appealed." *Natural Res. Def. Council v. Southwest Marine, Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001) (citing *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) (per curiam); *McClatchy Newspapers v. Central Valley Typographical Union No. 46*, 686 F.2d 731, 734 (9th Cir.1982)). However, on July 15, 2013, plaintiffs filed a motion to enforce the permanent

injunction which seeks to have the Court enforce the injunctive relief ordered in its FFCL and to set an Order to Show Cause why defendant should not be held in contempt. Plaintiff argued that the Court retains jurisdiction to enforce injunctive relief under Federal Rule of Civil Procedure 62(c) which allows a district court to "suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." *See Natural Res. Def. Council*, 242 F.3d at 1166. "The mere pendency of an appeal does not, in itself, disturb the finality of a judgment." *Wedbush, Noble, Cooke, Inc. v. SEC*, 714 F.2d 923, 924 (9th Cir. 1983). Where there is *prima facie* evidence of non-compliance, the district court is empowered to enforce the injunction. *See Armstrong v. Brown*, 857 F. Supp. 2d 919, 951 (N.D. Cal. 2012) (granting plaintiffs' motion to enforce injunction mandating defendants to provide prisoners with ADA-compliant accommodations). But Rule 62(c) "does not restore jurisdiction to the district court to adjudicate anew the merits of the case" and that any action taken pursuant to it "may not materially alter the status of the case on appeal." *Natural Res. Def. Council*, 242 F.2d at 1166. (citations and quotation marks omitted).

Defendant has not sought a stay of the Injunction pending appeal and it argued in its briefing before the Ninth Circuit that the FFCL are final and failure to abide by the Injunction during the appellate process could lead to a finding of contempt. The Court concludes therefore that it may review plaintiffs' motion to enforce the Injunction without risk of disturbing the appellate process.

In opposition to plaintiffs' motion, defendant argues that it has taken substantial steps ensure gender equality. [doc. nos. 226-229] In their reply, however, plaintiffs pointed out that defendant had not even addressed the majority of Title IX violation identified in the FFCL. After the August 26, 2013 hearing on plaintiffs' motion, the Court entered an Order holding in abeyance plaintiffs' motion to enforce the permanent injunction because defendant had not mentioned a significant number of the Title IX violations set forth in the FFCL and ordering defendant District to provide a

> complete informational Report concerning each area not addressed in its response to plaintiffs' motion that demonstrates compliance or non-compliance with the Court's Findings of Fact and Conclusions of Law. The Report must include full

> and responsive information and supporting documentation concerning compliance or non-compliance with the Court's Findings of Fact and Conclusions of Law that occurred between February 9, 2012 and September 9, 2013, with attentions to school years 2012-13 and 2013-14 . . . . [and]
>
> [to] allow plaintiffs' counsel and their experts access to the Sweetwater High School property to fully inspect the site for Title IX compliance/noncompliance . . . .

(Order filed August 26, 2013. [doc. # 231]) Plaintiffs requested leave to respond to the defendant's Report which the Court granted. Plaintiffs' response was filed on October 10, 2013. [doc. #243] Defendant did not seek leave to reply to plaintiffs' response.

Having received and considered plaintiffs' fully briefed motion; defendant's Report and exhibits; plaintiffs' response thereto including the second addendum to the Expert Report of Donna A. Lopiano; Sue Enquist's September 3, 2013 Site Report and exhibits, the Court enters the following decision.

## I. Discussion

In its Supplemental Report filed September 17, 2013, Defendant unequivocally states that the

> District is in full compliance with Title IX and the Court's February 9, 2012 Findings of Fact and Conclusions of Law. The District is committed to gender equality and has put the required checks and balances in place to maintain this commitment into the future.

(Dft's Supplemental Report on Title IX Compliance (Dft's Rpt.) at 1. [doc. #238]) Defendant asks that plaintiffs' motion to enforce the injunction be denied asserting that its evidence supports a finding of Title IX compliance and compliance with the Court's Injunction.

### A. Equal Participation Opportunities

The District first contends that it provides girls with athletic opportunities that are "substantially proportionate to their enrollment" at CPHS. (Dft's Rpt. at 1.) As the Court previously pointed out, substantial proportionality is not a strict ratio; however, it requires a close relationship between participation and enrollment. *Ollier v. Sweetwater Union H.S. Dist.*, 604 F. Supp.2d 1264, 1271-72 (S.D. Cal. 2009).

An example of the evidence defendant presents demonstrates that in school year 2012-13,

the difference between girls' enrollment percentage and percentage of girls participating in sports was 9.1%. This means that 98 additional girls would have played sports if participation were proportional to enrollment and no fewer boys participated. (Dft's Rpt. at 1-2.) In the years between 2008 and 2013, the percentage differences between girls' enrollment and participation in sports remains large. Indeed, the numbers suggest a worsening of conditions for girls' participation in sports.

In attempting to show substantial porportionality, defendant also points to rosters of the sports teams but those rosters lack basic information. Even more disconcerting is that defendant appears to have failed to maintain rosters for all sports years since the commencement of this litigation: "All participation numbers for years 2007-08, 2008-09, and 2009-10 were ascertained by counting the number of participants listed on team pages in each respective year's Castle Park High School yearbook because rosters were unavailable." (Glover[1] Declaration, ¶ 4. [doc. #236]) This obvious lack of systematic record keeping prevents the District from ensuring Title IX compliance and meaningfully demonstrating substantial proportionality.

The District also contends that there has been "expansive growth at CPHS with regard to female athletic teams in the past five years." ((Dft's Rpt. at 2.) Girls' tennis, waterpolo, and swim and dive are offered but these are not new athletic offerings. Field hockey, which was discontinued because of an inability to find a coach, has not been offered since 2009. The District notes that a girls' gymnastics program has been added but the number of girls participating has not been disclosed. Golf is listed as a girls' sport but no girls have participated in golf between 2007-2013. Similarly, lacrosse is listed as a girls' sport but no team has been formed.

Rather than showing that the number of girls actually engaging in sports activities, the District touts that it "will actually field more athletic sports teams for girls (10) than it does for boys (9) during the 2013-14 academic year." (Dft's Rpt. at 3.) But as the District provided in its own evidentiary material, there is a 98-girl participation gap this year. The District also states

---

[1] Thomas Glover is the Principal for Castle Park High School. (Glover Decl. at 1.)

that "the remaining three sports, football, wresting, and roller hockey are co-education sports." (Dft's Rpt. citing Glover Decl. ¶ 7.) For the last three seasons, however, participation in the co-educational sports has been 131 boys and 1 girl. (Glover Decl. ¶ 7.) The participation number is dispositive for Title IX compliance, not the number of athletic teams. The District has not demonstrated program expansion for girls.

In seeking to show compliance with Title IX and the Court's Injunction, the District further contends that it provided a formal written survey to determine the athletic interests and abilities of their students. (Dft's Rpt. at 3, citing Glover Decl. ¶ 9.) But the Survey neither asked for the gender of the respondents nor allowed students to suggest the sports they wish to play outside of pre-existing options. (Exh. B ("Survey") to Glover Decl.). The Survey offered appears so flawed that meaningful results of girls' interest in athletic activities cannot be determined and therefore, the District cannot rely on the Survey to show that girls' interests are fully accommodated.

Based on the evidentiary materials provided by the parties, it is beyond dispute that the District is not in compliance with Title IX concerning equal participation opportunities for girls.

**B.     Equal Treatment and Benefits**

    **1.     Recruiting**

In order to effectively recruit girls to play sports, team coaches must regularly interact with prospective students. (Plfs' Exh. A, Lopiano Rpt.[2] at 15.) But according to defendant, as of mid-September, CPHS lacked coaches for varsity and junior varsity girls' soccer, varsity and junior varsity softball and lacrosse. (Dft. Rpt. at 5.) There were no unfilled positions in boys' sports. Without coaches for these teams, defendant cannot adequately engage in meaningful recruiting. (Lopiano Rpt. at 15.)

Expert Lopiano's Report noted that:

> there was no current comparative data provided on recruiting practices of coaches of boys' versus girls' teams and no current comparative data on whether coaches

---

[2] Plaintiffs' Expert, Donna A. Lopiano, Ph.D., provided a "Second Addendum to Expert Report . . . Expert Opinion Requested" ("Lopiano Rpt). Dr. Lopiano's Report is attached as Exhibit A to Plaintiffs' Reply to Defendant's Brief on Title IX Compliance. [doc. #243]

of girls' vs. boys; teams are also full-time employees at CPHS who would be in a position to recruit.

(Lopiano Rpt. at 13.) Lopiano's Report indicated that "it appears that CPHS has undertaken significant steps to improve the recruiting of female athletes" based on the statements of seven girls' coaches but the steps are not consistently done by all the coaches. (Lopiano Rpt. at 14.)

During the September 2, 2013 site visit, various postings concerning student clubs and activities were visible to plaintiffs' counsel but there were no recruitment posting for girls' sports other than gymnastics. Although defendant contends the Daily Bulletin would show that girls are being recruited for sports, defendant has not provided copies of the Daily Bulletin or any evidence to support its contention. Further, defendant has failed to provide evidence that in the recruiting context, it is monitoring girls' participation which is likely because prior years' athletic rosters have not been preserved.

Defendant has failed to demonstrate that it has made adequate or consistent efforts to provide adequate recruitment for girls' sports.

### 2. Locker room, practice and competition facilities

For Title IX compliance, locker rooms are evaluated with respect to quality, size, location and accessibility. Dr. Lopiano notes that "significant changes" have been made "for both male and female student-athletes through the addition and/or improvement of portable buildings." ((Lopiano Rpt. at 15.) As a result, "previous inequalities" related to locker rooms and team meeting facilities have been solved. (*Id.*) The District is in compliance with the Injunction in this aspect.

The size, location and quality of practice facilities have seen "[t]wo significant improvements" – the softball complex "is close to being the equivalent of the baseball complex with regard to restricted use, dedicated instructional areas, safety, and maintenance." (Lopiano Rpt. at 17.) However, plaintiffs' expert concerning softball, Sue Enquist, asserts in her site- visit report[3] that the "softball field is still not equitable as compared to the baseball field." (Enquist

---

[3] Sue Enquist's September 2, 2013 Site Report is attached as Exhibit B to Plaintiffs' Reply to Defendants' Brief on Title IX Compliance. [doc. #243

Rpt. at 1) The tennis courts have been resurfaced. But actual maintenance of the facilities was unable to be assessed given a lack of information from the District. Such information must be maintained. The practice facilities appear to demonstrate the District's compliance with the Injunction.

Like the practice facilities, the softball and tennis competition facilities appear to be in balance. (Lopiano Rpt. at 19.) The availability of scoreboards continues to favor male athletes, however, and should be reviewed for all teams "to correct the current imbalance." (*Id.*) Dr. Lupiano was unable to assess facility preparation during her site visit. She notes, however, that "actual preparation of the facilities rather than scheduled maintenance would be determinative by examination of each sport facility on a regular basis including prior to scheduled competitions." (*Id.*).

Spectator amenities and safety deficiencies have been improved with respect to the softball facility. The tennis facility has added spectator seating. Rest rooms adjacent to the softball locker room/team meeting room, and adjacent to the new offices for coaches of girls' teams have been rectified issues previously identified as deficient. Parking and rest room access appears to be equitable for girls' and boys' sports. Nevertheless, as Expert Lopiano reports, "spectator seating and availablity of concessions remain areas of inequality. . . . Significant inequalities remain with regard to the availability of concessions at girls' events." (Lopiano Rpt. at 22.

The availability of scoreboards for sports continues to favor male athletes. *(See* Chart 5, Lopiano Rpt.) Scoreboards were judged to be superior for 45.9% of male athletes but only 31.5% of scoreboards for females were found to be superior; and 45.6% of the scoreboards of males were inadequate but 60.2% of scoreboards for females were inadequate.

Defendant has made efforts to improve the locker room, practice and competition facilities for the female athletes so as to be in compliance with gender equity but scoreboard availability is not in compliance. Notwithstanding its efforts, defendant's pace with such improvements places it outside of compliance.

      **3.**    **Equipment, uniforms and storage**

At her most recent site visit, Dr. Lopiano was provided with a sports equipment inventory for the first time. However, as she notes, she was unable to find information that would have "enabled me to evaluate 'quality' and little or no information on condition, purchase date, or maintenance history which would have allowed me to assess differences related to whether boys' and girls teams were operating with used versus new equipment." (Lopiano Rpt. at 24.

Instructional equipment, such as monitors, DVDs, laptop computers, white boards, was not inventoried. A regular inventory and maintenance log should be established. The Joint Amended Compliance Plan provides for this type of inventory so that conformity with Title IX can be met, assessed and maintained.

Because of general inventory deficiencies, it was not possible for the Dr. Lopiano, school coaches or the District to accurately determine whether there was a sufficient quantity of equipment that is in usable condition. Dr. Lopiano was able to review the quantities of some equipment and found: both boys' and girls soccer do not have a sufficient number of balls, boy's water polo indicates no head gear, both boys' and girls' soccer do not have adequate numbers of shin guards, boys' soccer lists no goalie gloves, and girls' basketball team had seven balls to the boys' team of 12.

According to Dr. Lopiano, equipment storage facilities and coach access to such areas are comparable for boys and girls sports. (Lopiano Rpt. at 24.)

The District, in order to comply with the Court's Injunction and the Amended Joint Compliance Plan, must take action to regularly and accurately inventory sports equipment and uniforms. Failure to do so creates the current situation where a valid analysis of inventory for Title IX compliance is not possible. Dr. Lopiano noted that a formal uniform purchase rotation policy has been adopted for the future, "[c]are must be taken to ensure that purchasing cycles are actually implemented."

Because the District has not adequately addressed the issue of inventory for equipment and uniforms, the Court must conclude that the District is not in compliance with this aspect of the injunction.

    **4.**     **Equitable Scheduling**

Gender equality is to exist with respect to access to practice and competition scheduling. Dr. Lupiano noted: "Title IX requires an analysis of each team's actual schedule during the 2012-13 academic year including both conference and nonconference contests and post-season championship or invitational events." (Expert Report at 24.) However, as Dr, Lopiano pointed out, she was "unable to determine whether gender equity exists because no new competition scheduling information has been provided." (Exp. Report at 25.)

The District has not provided new competition scheduling information. Similarly, practice times for each boys' and girls' team were not provided to plaintiffs or their expert. The District has not complied with the injunction by ensuring the availability of practice procedures and schedules, game schedules, and the posting of practice and game schedules. Equitable scheduling is a critical issue in determining gender equality and the District has failed to comply with the Injunction in this regard.

### 5. Equal Access to Coaching

Information concerning whether the District was in compliance with the equal access to coaching requirement was not provided to plaintiffs or their expert: "I was not able to perform a gender equity analysis because no information on the number and type (full-time CPHS employee or walk-on) of coaches CPHS provided to each girls' and boys' sport has been submitted for 2012-13." (Lopiano Rpt. at 26.)

Although the District provided the declaration of Principal Glover in attempting to compute coach-athlete teaching rations for male and female athletes, his methodology was flawed and not valid. Further, defendant should have provided information concerning the "the number of years the coach has coached at CPHS, the number of years of coaching experience each coach has had as a head coach and assistant coach and at what levels (junior high, high school, college, open amateur sport, varsity, junior varsity, etc.), and each coach's sports teaching or coaching credentials (coaching licenses, teaching certificates, etc.)." (Lopiano Rpt. at 26-27.)  As emphasized by Dr. Lopiano, "[c]oaches provided for girls' should be as experienced and qualified as coaches provided for boys. No information was provided about any of these criteria for all coaches of boys' or girls' teams. (Lopiano Rpt. at 27.)

Information about the annual evaluation of coaches was inadequate because a copy of the CPHS athletics coach evaluation policy, the evaluation instrument, or a list of evaluations completed and on file in the most recently completed academic year was not provided to Dr. Lupiano or plaintiffs. Further, no job descriptions for each coach was provided other than the postings for the five open coaching positions in girls' sports.

Athletic Director Ansolabehere's statement that "the qualifications and quality of the coaches of the girls' sports teams have been audited, and reveal that the coaches are qualified and provide quality instruction, teaching, training and conditioning," (Lopiano Rpt. at 27), is wholly unsubstantiated.

The Court finds that the lack of verifiable information from the District points out non-compliance with the Injunction in this area.

### 6. Medical training and services

The District, through Principal Glover's statement, states that "steps have been taken to ensure that a trainer and a physician are equally available to boys' and girls' sports." (Lopiano Rpt. at 27.) But his further states that a trainer and a physician are only available for football. (*Id.*). The District has provided no information on the presence or availability of sports medicine personnel on-campus other than during football games or that the Southwest Wellness Foundation sports injury clinic is actually used by male and female athletes.

As the District correctly notes, substantial changes have been made to the weight training and conditioning facility. Nevertheless, as Dr. Lopiano opines, "While improvements have been made, the facility is still not equitable with regard to training equipment equally suitable for both male and female athletes." (*Id.* at 28.)

Dr. Lopiano was unable to verify that the scheduling of the weight training facility provides slots of equal duration and equal access because of lack of information from the District.

Overall, the District has not met the requirements of the Injunction notwithstanding some improvements in the weight training and conditioning facility.

### 7. Publicity and Promotional Support

Included in this aspect of equitable treatment and benefits analysis are the uses of cheerleaders, band and pep squad, printed schedules, announcements, daily bulletins and electronic marquee, yearbooks and other student media, scorekeepers, statistics and videotaping and banquets and awards. In attempting to demonstrate whether publicity and promotional materials are equitable, the District, through Principal Glover, provided certain pages of the CPHS 2013 yearbook, but failed to provide Daily Bulletin announcements or digital marquee content printouts which are necessary for a proper gender equity analysis. Dr. Lopiano determined that the yearbook photos are not equitable for girls. (Lopiano Rpt. at 29.)

The District failed to provide Dr. Lopiano with "any documentation related to the occurrence of assemblies, pep rallies or other events at which athletics teams are introduced or honored, other than the statement in the Defendant's Brief (at p. 19) that such activities occur and boys' and girls' teams are equitably treated." (Lopiano Rpt. at 29.) Additionally, Dr. Lopiano notes that "[t]he Defendant's Brief (at p. 16) describes the use of cheerleaders, band and the pep squad but does not provide any data verifying the appearance of these groups at boys' and girls' competitive events." (Lopiano Rpt. at 29.)

### 8. Fundraising Benefits

"Title IX mandates that the institution treat its male and female athletes equally with regard to the "use of funds" (namely participation opportunities, treatment and benefits). Once funds are donated by outside entities . . . or raised by teams, the use of such funds cannot result in unequal treatment of male and female athletes." (Lopiano Rpt. at 29.) Dr. Lopiano was not given any information of the actual fundraising activities of boys' and girls' teams and how the such money was used. In the absence of fundraising information, neither the expert, nor the Court, can determine whether gender equity exists.

### 9. Conclusion re: Equal Treatment and Benefits

A recurrent and disturbing theme is obvious in much of the District's supplemental Report to plaintiffs' motion to enforce the injunction: the lack of verifiable documentation of compliance or even attempted compliance with the requirements for Title IX equitable treatment and benefits. The absence of inventories, reports or evaluations in a wide number of areas

suggests a haphazard approach to meeting the requirements of Title IX even after the filing of this lawsuit in 2007, and the Court's determination in February 2012, that the District had violated Title IX in myriad ways. This continuing lack of basic record keeping results in the District being unable to adequately establish and monitor different aspects of the CPHS athletic program for gender equity and to remediate disparities in gender treatment and benefits. Although there are reporting forms in the Joint Compliance Plan and the subsequently amended Joint Compliance Plan, it does not appear that defendant has used them other than sporadically.

In addition to her expert report, Dr. Lopiano provided a pre-publication manuscript entitled "Recommended Evaluation Instrument Monitoring Title IX Compliance (Gender Equity)" which noted that:

> [a]lthough the amount of data to be gathered is considerable, after the process is done, most institutions will find only minor changes occur from year to year. For instance, if policies are in place and they are executed in a nondiscriminatory way, then as long as the policies and practices don't change, the institution will continue to be in complaince and the policies don't need to be gathered every year.

(Exh. A to Lopiano Rpt. at 34.)

Although the Court is mindful that change in policies and procedures, as well as in practice, can consume time and money for a school district and schools, it is imperative that Title IX be recognized, understood and implemented as a rule of law.

It is apparent that the District has made some efforts in providing equitable treatment and benefits, particularly in the areas of facilities; however, the District has not demonstrated that it is in full compliance at this time with many of the areas previously noted as out of compliance in the Court's FFCL or that it has a comprehensive and systematic plan in place to fulfill its obligation to the female athletes at CPHS.

**C.    Administrative Activity**

In its FFCL, the Court noted that systemic administrative failures were responsible for much of the unequal treatment and benefits in CPHS athletic program. The lack of a comprehensive plan for achieving Title IX compliance by monitoring, oversight and enforcement procedures was noted at the time. And as pointed out above, the District has yet to meet its responsibility to provide for a comprehensive system to address gender equity.

       The Court notes that the District has hired William McLaughlin as the full-time District's Chief Compliance Officer for athletics. McLaughlin oversees Title IX for the District, including CPHS and reports directly to the District's Superintendent. As the Compliance Officer, he states that he holds monthly meetings with the athletic directors of all schools, including CPHS and that Title IX compliance issues are discussed at these meetings. (McLaughlin Decl., at 2.)

       Although the hiring of a compliance officer for athletics is a laudable effort, it is unclear that McLaughlin has specific knowledge about Title IX. Indeed, his resume lacks any reference to his training in Title IX compliance. The extensive absence of documented compliance materials with Title IX discussed above, particularly the failure to ensure rosters, inventory and the like are collected and maintained, suggests that McLaughlin has not adequately approached the District's and CPHS's difficulties in meeting their obligation to provide equitable opportunities, treatment and benefits for their female athletes in a meaningful way.

       The District contends that it has performed a survey of all athletic facilities for Title IX compliance. As a result of that survey, the District states that it has prioritized improvements. The District also states that it requires all schools, including CPHS, to upload the team rosters into the District's computer system so that reports showing percentage of participation by school site and gender can be generated. (Dft's Rpt. at 3.) Again, the lack of evidentiary support for the District's contentions suggests a misunderstanding of the need for and a reluctance to provide and maintain a comprehensive and systematic plan for gender equity.

       According to the District, it has implemented a training program for all coaches at the beginning of every sports season that McLaughlin conducts concerning Title IX issues. (Dft's Rpt. at 3.) But mere assurances that a training program is being conducted is insufficient to demonstrate that gender equity is being addressed in a planned, verifiable manner.

       McLaughlin states that the District monitors, collects, and reviews written data on athletic participation opportunities at CPHS. (McLaughlin Decl. at 3.) McLaughlin also states that an unidentified sport scheduler, who is trained to understand Title IX issues, shows that there is equality for travel, time and place. These statements are little more than unsupported assurances lacking documentation, a deficiency that has been repeatedly pointed out.

McLaughlin also notes that the District continues to report to the Office of Civil Rights on the biennial basis required by the U.S. Department of Education and will be submitting the next report during this school year, *i.e.,* 2013-14. But as plaintiffs correctly point out, McLaughlin has not suggested that he verifies the numbers provided to the Department of Education and verification would of necessity require accurate records – records that do not appear to be adequately and systematically collected and maintained at CPHS.

The District has not revealed a comprehensive, systematic plan for addressing the many continuing areas of noncompliance with Title IX. Although the Court recognizes that the District has taken some remedial measures – including some costly decisions concerning facilities – and made some progress with gender equity in its athletic program, that progress is not consistent, adequate, comprehensive or well documented, planned, or reasoned. The District must, in order to comply with Title IX, implement policies and procedures that will address the remaining areas of non-compliance and maintain those areas that have improved sufficiently to demonstrate compliance.

### D.     Retaliation

"[R]etaliation against individuals because they complain of sex discrimination is 'intentional conduct that violates the clear terms of [Title IX].'" (FFCL at 26)(citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173–174 (2005)). The Court found that defendant had retaliated when it fired the girls' softball team's coach for reporting inequalities between the boys' and girls' athletic teams. As plaintiffs correctly point out, defendant has failed to provide any evidence of efforts to address the Court's finding of retaliation. In order to be in compliance with Title IX and the injunction entered in this case, the District must take steps to address retaliation. It has not done so. Accordingly, the Court finds that the District has not complied with the injunction.

## II.     ORDER TO SHOW CAUSE

Although the District continues to assert that it is in full compliance with the Court's Findings of Fact and Conclusions of Law, this assertion is based on assurances with little to no supporting documentary evidence. Dr. Lopiano noted those areas where the District was in

compliance and not in compliance. Having reviewed the motion to enforce the permanent injunction, defendant's response to the motion and supplemental Report on Title IX compliance, plaintiff's reply and supplemental reply, the Court finds and concludes that the District has not fully complied with the injunction by taking all reasonable efforts to implement Title IX compliance and plaintiffs' motion to enforce the injunction is well taken.

**III. CONCLUSION**

Based on the foregoing, plaintiffs' motion to enforce the injunction is **GRANTED**. Defendant is **ORDERED TO SHOW CAUSE** why it should not be held in contempt for its failure to fully comply with the Court's Injunction. The statement of cause shall be filed on or before March 31, 2014. Plaintiffs may file a response to defendant's statement of cause on or before April 14, 2014. A hearing may be scheduled on the contempt issue after briefing has concluded and at the Court's discretion.

**IT IS SO ORDERED.**

DATED: March 17, 2014

M. James Lorenz
United States District Court Judge

COPY TO:

HON. JAN M. ADLER
UNITED STATES MAGISTRATE JUDGE

ALL PARTIES/COUNSEL